May it please the Court, Stephen Rosales on behalf of Rudy Rojas, the Plaintiff Appellant in this matter. Often a catastrophic injury is one that focuses on the means. Getting hit by a bus while crossing the street, falling off a horse and breaking your neck. But often a catastrophic injury can also be the ends and not necessarily the means. In this case, Mr. Rojas unfortunately stepped on a nail in November of 2005. He also at that time had been suffering for several years from diabetes, which complicated his healing process. He initially stayed several days in the hospital in December of 2005, healed up, began to have ulcers in his right foot, which ultimately led to having a good portion, if not nearly half of his foot, amputated off on the right side. The focus on this case deals with that evidence that postdates the existing evidence. Social Security examining physician opinions as well as the non-examining opinions. We can see the progressive nature of this debilitating injury by looking at those opinions. In May of 2006, the first consultative examiner noted that he had no limp on the right side, considered him status post right foot infection, and that it was well healed with no open sores. The non-examining state, and that's in the record at 209 through 211. The non-examining state agency physician in July of 06 essentially found the same diagnosis. He was, your client was examined in February of 07 by Dr. Canassis. Do I pronounce that correctly? Canassis I think was the May of 06. No, D-A-N-A-N-I-S. Starts with a D as in David. Damania. Damania. Yes, D-A-N-A-N-I-A. And she, in fact, all the doctors here were women, right? I believe so, yes. Okay. So she examined him and looked at his foot, et cetera, did not find osteomyelitis, did not order an MRI. Is that correct? Correct. She only reviewed the... All I'm looking for is a yes or no. Correct. Is that correct? Correct. In June of 07, your client was examined by Dr. Siddique. Am I pronouncing that right? I believe so, yes, Your Honor. This is a test of pronunciation abilities in this case. And she ordered an MRI. Correct. And that MRI indicated osteomyelitis, and she recommended partial amputation, correct? Correct. And your client initially refused, but a few months later, part of it was, was it right foot? Right foot. Right foot was amputated. Correct. I think after the second MRI in August of 07, where it had continued to progress even in that two-month period, I think probably is what convinced them finally to have the surgery. I didn't handle this case at the administrative level, but in my review of the record, what you've described is correct. And the only post-amputation medical report of any kind is done by Dr. Srinivasan? Correct. Did I get that one right? Okay. That's how I pronounce it, Your Honor. Well, if you watch PBS NewsHour, you pick that up. But that's the only report that's post-amputation? Yes, Your Honor. My understanding that you did not handle the case before the ALJ, is that correct? Correct. Did counsel for Mr. Rojas request that your client be reexamined in light of the amputation? In my review of the record, no, Your Honor. The answer to that would be I don't remember or I don't recall seeing that, and so I would say no, he didn't make that request. Okay. Was that suggested at the district court level? I don't believe that I specifically asked for a reversal or remand for further legal proceedings, and obviously that would be to update the record. But I don't specifically say he needs another examination. I didn't say that. And is it correct that the ALJ in reaching, is it he, the ALJ? I believe so, yes. Your Honor, his conclusions relied entirely upon medical reports that were pre-amputation. Yes, Your Honor. And I somewhat equivocate a bit because an interesting note is that he actually found as a severe impairment the right foot osteomyelitis. And the only way he could have done that, as you've already noted, was the ALJ. The ALJ, as we already noted, Damani and the CE examiner rejected that diagnosis. And so the only way the ALJ gets to that severe impairment is by relying on the treating records to get there as of June, post-June. Let me ask about the burden at this point, because your client hadn't worked, is that correct? Correct, since I believe 02, Your Honor, 02 or 03. So you kind of pass through number 4 into 5? I mean, does the commissioner have the burden at this point, or does your client? The ALJ, if I recall correctly from the record, made the finding that my client had no past relevant work. It wasn't that he couldn't probably, just he had none. And so therefore, he would automatically pass through step 4, and this is a step 5 case. In this particular case, I certainly am aware of the fact that post-amputation, that you had no doctors other than Suryavansan, however you say it, look at it. But on the other hand, it appears to me that both the ALJ and the district court considered the amputation at some length. For example, at AR-15, the ALJ, your client testified that on November 13, 2007, toes and part of his foot were amputated due to bone infection. He testified he had pain in the right foot before the amputation. Wearing shoes would tear up the wound even more. He could walk without crutches or a cane. But if he put pressure on his foot, the wound would open up, and then he would have to use a cane. Do you dispute that that occurred, that he made the test so it testified? I don't dispute that the ALJ was aware of the amputation. I mean that your client so testified to the ALJ. Right, that he required assistive devices and was in a wheelchair at the hearing after the surgery. So the ALJ considered it from the testimony. And when he asked the vocational expert the hypothetical question, he asked him whether he could perform any job in the national economy if he were of the same age, education, and work experience as plaintiff, expressly considering the possible loss or use of either foot. Do you remember that? I do, Your Honor. So at least as far as the ALJ is concerned, there was consideration at Step 4 and 5 about the loss of the foot. The district court likewise described the amputation at AR-2. He appeared in the wheelchair, acknowledged that. The district court relied upon the ALJ's questioning, considering the possibility of the loss of either foot. I guess what I'm struggling with, I mean, I have great empathy for your client. Don't get me wrong. But what we're wrestling with here is you've got two previous medical reports which recognize the, I forget how you say it, osteomyelitis or whatever that led to the amputation, the bone problem, if I recall correctly. No, Your Honor. Okay. The, as Judge Hawkins pointed out in reciting the most recent consultative examination from April of, I'm sorry, February of 2007, Dr. McMahon, he rejected that diagnosis. He said he didn't have osteomyelitis relying on the September 06 MRI. Osteomyelitis doesn't appear in the record, based on my review, as a positive or suspicious until April of 07, at 308 to 309. And so I understand where you're going with respect to a Step 4 or 5 analysis, but as I mentioned, at Step 2, he finds the myelitis as, osteomyelitis as a severe impairment. And so the question becomes under the regulations, what impact would that have as well under Step 3? I mean, in the regulations that deal with musculoskeletal impairments, for instance, which we don't directly have here, that regulation in the list of impairments, I believe 1.02 and 1.04, deals with dysfunctions of the weight-bearing joint that require or prevent the ability to ambulate effectively, which usually defined in the regulations is having to use two assistive devices to ambulate. Let me kind of cut to the chase here, because this can maybe help me make up my mind on this. Okay. Let's assume for a moment that your client didn't have an amputation, okay? I know it's very important, and we're going to get back to that. But let's assume for a moment that the ALJ had two doctors who complied with all the regulations and the rules and so on. The later report, the doctor clearly did not. So if there had been no amputation, would you agree that the ALJ would have, again, hypothetically, been entitled to rely on the previous two reports and not the later report? If yes, Your Honor. Okay. So what we're really talking about here is the impact of the amputation. The first two had not reviewed what happened with the amputation before. The second one did, but it was a defective report. So then we get to the question of if the later doctor's report was defective and the first two were okay and then you had something that happened subsequently, what do we do with this? That's really what I'm struggling with. Right. And it seems to me that the ALJ did consider the amputation and the district court did consider the amputation. Tell me why that's not enough. Because we have the first CE in May of 2006 that says he has really nothing but a status post right foot infection well healed. No limb. But he's still limited to four hours standing and walking. Right. A little less than 10 months later, Dr. Zemanian now says he does have some ongoing foot ulcer problems, diabetic right foot is what he called it, but no osteomyelitis. And now he can only do, 10 months later, two hours of standing and walking. So let's fast forward another 10 months and now we have, he's missing part of half of his right foot. What do you do with step five? The vocational expert clearly was given a question that assumed a partial loss of the right foot. Why does that not satisfy step five? Because I don't know. He says assuming that you've got a partial loss of the foot, there are jobs in the economy that can be satisfied. My best response to that is that the medical limitations that arise out of the loss of the right foot in connection with the constellation of all his problems, the diabetes, some other low back problems that appeared in the record, which I think the ALJ documented in the severe impairment finding. Was the voc expert asked to, hypothetical, assuming Dr. Srinivasan's opinion? No. Report. No, I think that. The voc expert was not said, here's what Dr. Srinivasan says. She says, this, this, this. Was the voc expert asked that? No, and that's the way I would, I do it at my hearing. I mean, I take a treating position and I don't play around, I just read it verbatim to whoever I need to read it to, a vocational expert or to the ALJ to make sure I get it down. But what the ALJ did here is ask what I believe is Dr. Damanian, which ultimately formed his RFC finding, and then simply asked about a sedentary individual, someone limited to sitting down. And the reality is that an individual, even if they could sit all day long, can still be found disabled in the process at step three. And so. So let, just to pinpoint it, if you have no medical evidence, if the burden's on the Commissioner, you have no medical evidence that, in the ALJ's view, was admissible, rejecting the Cervisian testimony, but there's no medical evidence as to the amputation that's before the ALJ, is that correct? If you reject the doctor's report. No. There is, there is evidence of the amputation as being scheduled and as testified to by Mr. Rojas. Right. By his own testimony, and of course he shows up at the hearing. Right. But I've asked if there's medical evidence. Of the actual amputation? Yeah, and the effect of the amputation. The actual surgery report? No. The surgery occurred, I believe, by testimony November 13th, and the hearing was less than three to four weeks later, December early part. So what is your actual argument then? Is it that the vocational expert was given an improper hypothetical, or is it that there's not substantial evidence for the ALJ to conclude based on the record? I guess, in a perfect world, my question would be to Dr. Domanio. Now that he doesn't have part of his right foot, would you still find that this That's not an answer to my question. No, no. Listen to my question again. No. Listen to my question again and answer the question I asked, not an argument about what you might have said had you been the lawyer at the hearing. Okay. We got the record in front of us. That's the record we're dealt. Okay. The residual functional capacity mirrors what Dr. Domanio found, but that predated the amputation and rejected the ultimate impairment that led to the amputation. And so how can an ALJ find or how can we uphold a residual functional capacity that doesn't consider the impairment that ALJ found to be severe, which was the right foot osseomalitis, and ultimately the amputation that arose out of it? And so that's what we need to read, ma'am, is to properly determine what impact this amputation has on its ability to ambulate effectively. Because here we can see what the Would you anticipate there would be further testimony on that? There would be further testimony on that. And I would anticipate that a reasonable adjudicator would secure another examination. You might want to save your couple seconds.  I will, Your Honor. Thank you. Good morning, Your Honors. Timothy Boland on behalf of the Commissioner of Social Security. The ALJ properly rejected a medical opinion that was questionable on its face, and in light of claimant's own testimony and conduct at the hearing.    and in light of claimant's own testimony and conduct at the hearing. I understand this case correctly. The ALJ relied upon medical opinions of doctors issuing reports prior to the amputation, correct? That's correct, Your Honor. And not only doctors who didn't assess the amputation, they were doctors, at least some of them, that examined Mr. Rojas and didn't detect the osteomyelitis, correct? That's correct, Your Honor. So you have an ALJ relying upon pre-amputation opinion, no opinion asked of them post-amputation. And not only that, there are doctors who didn't diagnose the very problem that led to the amputation, right? That's correct. So we should affirm the ALJ in that circumstance. Yes, Your Honor, because the ALJ relied on consultative examiner Dimania's report. She was the one that didn't detect osteomyelitis, right? She did not, but she found diabetic right foot with a definite non-healing ulcer, no odor but serostype discharge and discoloration. Did she recommend amputation? She did not, but she assessed limitations based on claimant's inability to put full weight on that foot. And are we supposed to intuit that that assessment is equivalent to what would happen once you had the amputation? The amputation was a corrective procedure, so in theory it corrected this problem. Claimant had opportunity to provide information. Whose burden is it? That we're looking at here, the claimant or the commissioner? It's claimant's until step five, and then it becomes the commissioner's burden. Right. So when claimant submitted this last opinion, Dr. Srinivasan's the only opinion postdating the amputation, counsel submitted that opinion at the hearing, and the ALJ asked, with the addition of this evidence, is the record sufficiently complete that I can make a fair decision in Mr. Rojas's case? Counsel replied yes. Claimant had opportunity to submit further information and opinions supporting the limitations assessed by Dr. Srinivasan and the post-surgical limitations the plaintiff alleged. Claimant could have submitted that evidence to the appeals counsel. Of course, at this point he doesn't know that there's Dr. Srinivasan's opinion is going to be deep-sixed, basically. That's correct, but it was properly deep-sixed. Am I correct that Srinivasan's opinion appears at 335 of the record? Is it this? Look up here. Sorry. Is it this? Yes, that it is. It's one of these check-the-boxes thing. It's a check-box opinion, Your Honor. It's also internally inconsistent. Dr. Srinivasan checked just about every environmental limitation, which all of these, as the ALJ pointed out, corresponded to no medically determinable impairment. Did he consider check-boxes from the other doctors? Yes. The state agency reviewing physician assessments of residual functional capacity are in check-box form. And those were okay? Well, those are the standard forms that the agency uses for state agency reviewing physicians. Srinivasan's is not the same form? It's not the same form. It's, in fact, an in-house attorney form, an in-house prepared form. I believe it was. It's not approved form number 0960-0662? I'm not aware of the form number, Your Honor. Well, look at 335. It is an HA form. Are you telling me that this form was prepared in a lawyer's office? No, no, no. I'm sorry, Your Honor. I was mixing this opinion up with a different one. This is an agency form. But it does ask that the doctor identify the particular medical or clinical findings. Why would you say it was prepared in a lawyer's office? It's clearly a form of the agency. I was mistaken, Your Honor. We have a plaintiff's certain office that often files these forms and submits them to the physician in order to elicit an opinion. And I was mistakenly misremembering this one. Are you implying that that's what happened here? No, certainly not, Your Honor. But, again, this form, being an agency form, asks that the physician identify the particular medical or clinical findings, physical exam findings, X-ray findings, laboratory tests, results, history, and symptoms, including pain, et cetera, that supports the assessment of limitations. Is the commissioner confident that non-prejudiced, impartial medical opinion addressing the amputation and abilities, specifically RCF post-amputation, would still justify denial of disability benefits? In this case — Can you answer that with a yes or no to begin? Yes, Your Honor. Then why do you resist remand for that? Because substantial evidence supported the RFC finding. Evidence of doctors that didn't diagnose the malady that led to the amputation and rendered prior to the amputation. And the agency thinks that's okay. It's not a perfect situation, Your Honor. My sympathy is with the claimant also. However, there was — Isn't this process about fairness? Certainly, Your Honor. What harm would befall the Social Security Administration if you did what I just described, have impartial, non-involved doctors examine Rojas' foot and render opinions as to his RCF? What harm would befall the agency? Well, the agency has to process millions of claims, and the agency has to be able to rely on consultative examining opinions. And in this case, the agency properly did so. Don't you — in what we really got here, it's kind of a form over substance issue. I'm inclined to agree that under normal procedures that the ALJ was within its rights to determine that the report by, I'll call it Dr. S. simply didn't comply with what was necessary, and the earlier reports were correct. But as my colleague, Judge Hawkins, points out, the earlier report turns out they fundamentally don't reflect what had happened by the time Mr. Rojas got to the hearings. Clearly, they took — they were aware of the amputation by the latter part of the ALJ's decision. The question that was posed contemplated that. The district court, of course, was aware of that. I guess I would ask, along with my colleague, Judge Hawkins, let's assume hypothetically that the agency could win here based upon the technicalities of this. On the other hand, you've got a guy who's had an amputation. This is — this was not well handled by any stretch of the imagination. He may lose ultimately if we set it back. If we set this back with a memorandum disposition not setting any kind of a precedent, why would the agency oppose that? Your Honor, the impairment that took up the bulk of the period under the ALJ's consideration was this foot infection. The ALJ relied on medical opinions that looked at that foot infection. And said that it was healing properly. That was the first consultative examination. The second one, the more recent one, in February 2007, found an open, non-healing ulcer and assessed limitations, the most severe limitations, apart from the state agency reviewing physician opinion of the following month, which considered the consultative examiner's opinion. And it was that infection that led up to the amputation just before the hearing. So from January 2006, the date of the claimant's application, to March 2008, the date of the ALJ's decision, there was corrective surgery five months before the end of that period. Corrective surgery to fix the osteomyelitis. Therefore, the last two opinions of functionality were, if anything, we can — I mean, we can't assume, but it seems likely. The difficulty is that you're trying to read backwards into a medical opinion that didn't assess these facts. And so maybe I join with my colleagues to say, why don't we just find out what the real facts are? Maybe they'll say, well, you know, actually the way we described the limitations here and the way it worked out in the surgery are parallel, and therefore the decision stands. Or maybe they'll say, well, it is corrective surgery, but it doesn't necessarily mean that there's a one-for-one parallel result in terms of disability. You know, it's just such a dramatic thing to have an amputation, and we don't really have an opinion. We're having to impute it. Do you have a case that basically would permit us to take what was a dramatically changed circumstance and impute a prior medical opinion? Imputing a prior medical opinion. Or maybe it's projecting it forward is a better way to put it. It's projecting forward a prior opinion as to that it would also hold some, you know, year or months down the road. Well, not precisely, Your Honor, but it's the ALJ's job to look at all the medical evidence and create a synthesis of that medical evidence and come up with a residual functional capacity. In this case, the ALJ did that. I mean, considered the diagnosis of osteomyelitis and assessed that as a severe impairment, came up with a residual functional capacity that was more severe than the previous opinions based on Klayment's testimony that he could not use that foot. Even Dr. Sreenivasan assessed Klayment as being able to frequently use foot pedals, but the ALJ precluded that entirely. So it's the Commissioner's position that there was enough here for the ALJ to come up with this residual functional capacity. At the end of the day, the vocational expert's determination was, did consider the loss of the part of the foot, right? Right. The vocational expert specifically testified that the three jobs identified did not require the use of the foot. So were we to send this back and they went through everything and there was new evidence and there was a determination that it was more disabling than otherwise, if you get to the same question and you have the same answer, he still doesn't win, right? Precisely. Well, if the Court has no further questions. Thank you. Commissioner Smith. We have a minute for rebuttal. I may have misspoke, Judge Hawkins, in response to your question. On page 69 of the record with respect to the testimony of the vocational expert, it does appear the ALJ began to ask the vocational expert to assume the lifting and carrying ability of Mr. Rojas as well as the standing and walking capability and sitting capability as described by Dr. S, if I may. And the response was, you don't need to go on any further. That alone would, because it wasn't an eight-hour day, stop anyone from working at all occupations. That's on 6970 of the record. And so it's clear that when assuming even the first initial two pages of Dr. S's opinion, that gets us to a no-work finding. I think there's a lot of focus on what Dr. S did or didn't say or how it was consistent. Some of the environmental limitations include being away from unprotected heights, not being in extremes of heat or cold, which, you know diabetes, it's a vascular condition as well. It makes sense. There is support for those types of limitations. And finally, the description of an amputation as a solution to a problem I don't think is adequate, because it brings along its own problems. And the vocational expert was only asked to assume that all that an amputation with respect to the right foot would preclude would be the use of a foot pedal on the Is there a further diminishing in the capacity from what Dr. Damanian found because of the amputation? And Dr. S answers yes. And so we believe that reamount for the reasons already discussed would be appropriate. And if Dr. S's opinion is found to have been the correct one, then the consideration should be for reversal for payment, because it would save what the Commissioner wants, another one of million one in the stream of millions, and it would save the Commissioner to focus on those that need to be focused on. Thank you, Your Honor. Thank you. I'd like to thank both counsel for your argument this morning. Rojas v. Mr. Drew is submitted and we're adjourned for the morning.
judges: Hawkins, McKeown, Smith